COMMONWEALTH *vs.* ISAAC RODRIGUEZ
(and a companion case[1]).

No. 04-P-97.

Suffolk. February 10, 2005. - June 6, 2005.

Present: ARMSTRONG, C.J., BROWN, & KAFKER, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Deliberation of jury,
Instructions to jury, Sequestration of jury.

This court concluded that a Superior Court judge's discharge of a juror during
deadlocked jury deliberations at a criminal trial was not an appropriate
exercise of the circumscribed discretion permitted the judge in the
circumstances and required reversal of the defendants' convictions, where
the judge did not question the juror about her ability to be fair and
impartial, where there were no findings that the juror had physically
separated herself from the other jurors or had refused to participate in the
deliberations, and where the judge's exclusive stated basis for the juror's
discharge was her communications with her mother and cousin in violation
of her oath and the judge's instruction, which violation was inextricably
connected to the juror's relations with her fellow jurors, the deadlock, and
the juror's apparent hold-out status [672-676]; further, the judge's instruc-
tion to the jury on the discharge, which was incomplete and created the
risk that the remaining jurors would speculate that the discharge was based
on the juror's view of the case or her relationship to her fellow jurors, cre-
ated a substantial risk of a miscarriage of justice and provided an ad-
ditional basis for reversal [676-678], a conclusion reinforced by the jury's
improper exposure to, and uninstructed consideration of, a statute that one
juror had found on the Internet and had introduced into the deliberations
[678-679].

INDICTMENTS found and returned in the Superior Court Depart-
ment on January 16, 2002.

The cases were tried before *Geraldine S. Hines*, J.

*Paula Finley Mangum* for Isaac Rodriguez.

*Robert D. Dimler* for Dorman Lopez.

*Carina Canaan* (*Paul B. Linn*, Assistant District Attorney,
with her) for the Commonwealth.

---

[1]Commonwealth *vs.* Dorman Lopez.

KAFKER, J. After a joint jury trial in Superior Court, the defendants, Dorman Lopez and Isaac Rodriguez, were both found guilty of trafficking in cocaine in amounts exceeding 200 grams.[2] On appeal, the defendants argue that the judge (1) improperly discharged juror thirteen, apparently a hold-out juror on a then-deadlocked jury, for comments that she made about other jurors while she was on a cellular telephone in the jury room; (2) failed to instruct the reconstituted jury properly on her reasons for the discharge of juror thirteen; and (3) conducted an incomplete voir dire of the jury regarding their consideration of a statute that one of them had found on the Internet and that the jury referenced in their complaints about juror thirteen.[3] We reverse.

1. *Background.* The police conducted surveillance at 431 Dudley Street in the Roxbury section of Boston in November, 2001. They observed Lopez and Rodriguez enter and leave the building and drive away in a manner indicating that the defendants were wary of being followed. The police then observed an exchange between Lopez and another man on November 30, 2001, that resulted in the recovery of a bag of cocaine from the man's trunk and the arrest of the three

---

[2]A third defendant, Milton Lopez, was acquitted of the same charge. Dorman Lopez was also charged with one count of unlawful distribution of cocaine. On this count, the judge allowed the defendant's motion for a required finding of not guilty filed at the close of the Commonwealth's case.

Each of the three defendants was also charged with one count of conspiracy to violate the controlled substances act, and in each instance, the charge was dismissed at the conclusion of the jury trial.

[3]Lopez makes an additional claim that his motion to suppress evidence seized pursuant to a search warrant was improperly denied because the affidavit filed in support of the warrant failed to demonstrate probable cause. We conclude that, while the information supplied to the police by the anonymous informant and set forth in the affidavit was insufficient, standing alone, to satisfy either prong of the familiar test set forth in *Aguilar* v. *Texas,* 378 U.S. 108, 114 (1964), and *Spinelli* v. *United States,* 393 U.S. 410, 414-415 (1969), when viewed together with the additional corroborative information in the affidavit that was uncovered in the subsequent police investigation and surveillance (including the observation of a transaction by Lopez resulting in the recovery of cocaine), the affidavit demonstrated probable cause to believe that the defendant was selling drugs, as well as a nexus between those sales, 431 Dudley Street, and Lopez's automobile. See, e.g., *Commonwealth* v. *O'Day,* 440 Mass. 296, 300-305 (2003). See also *Commonwealth* v. *Hardy,* 63 Mass. App. Ct. 210 (2005).

defendants. See note 2, *supra*. The Boston police sought and obtained a search warrant for the dwelling and the motor vehicle the defendants had been using.

During the execution of the warrant, the police found four bags of cocaine inside the car and recovered almost 900 grams of cocaine from inside the apartment. Police also seized more than $25,000. Identification belonging to both defendants was found inside the apartment.

Because none of the defendants' claims on appeal relate to the sufficiency of the evidence presented at trial, we do not summarize the evidence from trial. With the exception of the argument raised by defendant Lopez addressed in note 3, *supra*, the issues on appeal all involve the handling of the jury deliberations.

2. *Discharge of the juror*. The judge instructed the jury at the beginning of the trial "not to discuss the case or anything about it with each other or with anyone else." She also instructed the jury not to "try to do any research or any investigation of your own." On numerous occasions during the trial, the judge restated that the jury were not to discuss the case amongst themselves or with anybody else until it was time to deliberate.

Deliberations commenced on October 23, 2002. When deliberations ended that evening, the judge told the jury:

> "Well, I will excuse you now . . . with the strongest admonition that I can give you, now that you have begun your deliberations, not to discuss the case among yourselves, no telephone calls with your fellow jurors tonight, not to talk about anything that went on today. Any time you deliberate you have to be all together to do that, so that is strictly forbidden. And you are not to discuss it with anyone else. . . ."

The judge repeated this admonition throughout deliberations.

On October 25, 2002, the jury asked the judge for a "more detailed definition of 'speculation,' and [whether] personal theories [are] acceptable for jurors to put in their verdict?" The judge and counsel agreed on a definition of "speculation" and further agreed to answer the second question with "jurors must rely on the facts as you find them from the evidence."

At 3:00 P.M., the jury submitted another note to the judge stating that "[t]here is evidence on the jury table which some jurors refuse to acknowledge as evidence. Secondly, juror number thirteen requests to be replaced with the alternate due to a hung jury." The judge said to counsel that "this sounds like there is a disagreement, difference of opinion about the value of whatever it is that they're discussing and juror number thirteen and no other jurors can ask to be replaced because they can't agree." Finally, the judge stated that the jury were "essentially apprising us in a way that's inappropriate about their deliberations." The judge then informed the jury that "these comments appear to relate to the substance of your deliberations" and "do not require comment from the Court." Fifteen minutes later, the judge received another note, signed by the foreperson, that stated, "We are hopelessly hung, Judge. We thought we were getting to a verdict but we are now entrenched. We have tried to follow your instructions. Help us!!!"

The judge determined that there had been due deliberation and decided to give a *Rodriquez* charge. See *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-103 (1973).[4] Before she gave it, however, the jury sent a note to the judge stating, "Judge, I think we may have a new breakthrough. May we have fifteen minutes?"

About twenty minutes later, the foreperson sent a note to the judge stating, "I'm sorry, Judge. The breakthrough I had hoped for did not happen. Please help us." The judge thereafter gave a *Rodriquez* charge, reminded the jurors not to discuss the case with each other or anyone else, and dismissed them for the weekend.

On Monday morning, the judge checked with the jurors to make sure they had complied with her instructions, and then repeated a *Rodriquez* charge, after which the jurors resumed their deliberations. About an hour later, the jury submitted a note to the court asking, "May we please have a copy of the oath we as jurors took when we began this trial?" The jurors were brought into the courtroom and the court clerk repeated

---

[4]The judge here consistently referred to the charge as a *Rodriquez* charge; it is often identified as a *Tuey-Rodriquez* charge. See *Commonwealth* v. *Tuey*, 8 Cush. 1, 2-3 (1851).

the oath: "You shall well and truly try the issue between the Commonwealth and the defendant at the bar according to your evidence, so help you God."

Almost two hours later, the court received the following two notes, both signed by the foreperson:

> "Judge, the juror who wishes to be excused is on the phone (her cell phone) talking about the jury deliberation process with someone. I have heard her and I think others have, too. Her anger is preventing us from doing our duty as a jury.

> "Your Honor, we have come up against a wall under Chapter 234, Section 26(b).[5] We respectfully ask for the alternate juror because the juror is not and will not participate in the jury process."

A voir dire of the foreperson followed.

| | |
|---|---|
| THE COURT: | "[W]hat I need to hear from you is, what exactly did you overhear on the telephone?" |
| FOREPERSON: | "Okay. I overheard her discussing certain jurors and her relation to them." |
| THE COURT: | "First of all, tell us which juror you're talking about." |
| FOREPERSON: | "Thirteen." |
| THE COURT: | "Okay." |
| FOREPERSON: | "And she discussed her anger and she's |

---

[5]General Laws c. 234, § 26B, as appearing in St. 1967, c. 285, provides:

"In a civil or criminal case . . . to be tried with a jury in the superior court, . . . [i]f, at any time after the final submission of the case by the court to the jury and before the jury has agreed on a verdict, a juror dies, or becomes ill, or is unable to perform his duty for any other good cause shown to the court, the court may order him to be discharged and direct the clerk to place the names of all of the remaining alternate jurors in a box and draw the name of an alternate, who shall then take the place of the discharged juror on the jury, which shall then renew its deliberations with the alternate juror. . . ."

not going to put up with this, you know, and it's very tense in there. . . ."

THE COURT:    "You overheard her say specifically what?"

FOREPERSON:    "That she's not going to put up with this, that they've been trying to tell me what to do, and talking, specifically talking — I don't know the other juror's number but another juror that she has issues with, she was mentioning this person and just — and then she covered her mouth like this and was talking like this."

THE COURT:    "Where was this conversation taking place?"

FOREPERSON:    "It was taking place in the room itself and then she took the phone out into the side room and was talking for quite a while."

THE COURT:    "Was this while the deliberations were going on?"

FOREPERSON:    "This was when we had just started lunch."

                    . . .

THE COURT:    "Was that the first time you observed this juror using the telephone while you were in the room?"

FOREPERSON:    "No."

The judge instructed the foreperson not to disclose their conversation to the other jurors and had her return to the jury room. The judge next questioned juror thirteen. The pertinent portion of that inquiry is as follows.

THE COURT:    "Can you tell me whether or not you had a cell phone in the jury room?"

JUROR THIRTEEN: "Yes, I have."

THE COURT: "Okay. Have you been talking on that phone?"

JUROR THIRTEEN: "When we have breaks, yes, I have."

THE COURT: "Okay. And have any of those discussions related to the deliberations?"

JUROR THIRTEEN: "No, it wasn't."

THE COURT: "Okay. Have you not — you represent to me that you have not said anything during those discussions to anybody about what's happening in the jury room?"

JUROR THIRTEEN: "No, I haven't."

THE COURT: "Okay. When did you make a call on your phone?"

JUROR THIRTEEN: "When we went in to break for lunch."

THE COURT: "Um-hum. Okay. And who did you call?"

JUROR THIRTEEN: "I had called my mother and I also had a call come in to me as well."

THE COURT: "Okay. And you talked to your mother?"

JUROR THIRTEEN: "Um-hum."

THE COURT: "And who else?"

JUROR THIRTEEN: "And then my cousin had called me."

THE COURT: "Okay. And did your cousin know that you were on jury duty?"

JUROR THIRTEEN: "No, she didn't. I had to let her know that I was at court right now. She asked me if I was in the courtroom. I said, no, I'm not in the courtroom, I'm having lunch right now."

Commonwealth *v.* Rodriguez.

THE COURT: "Okay. Where were you when you had this conversation?"

JUROR THIRTEEN: "In the little room right before you get to the bathroom, there's a jury room."

THE COURT: "Did you have any telephone conversations in the main room where you all are sitting, having your lunch?"

JUROR THIRTEEN: "Yes, I did."

THE COURT: "Okay. Who were you talking to?"

JUROR THIRTEEN: "I was talking to my mother at that time."

THE COURT: "Um-hum. And what was that conversation about?"

JUROR THIRTEEN: "What did she ask me? She was just asking me if I needed to be picked up and that was basically it. We were talking about if —"

THE COURT: "Did you discuss the deliberations with your mother?"

JUROR THIRTEEN: "No, I wasn't."

THE COURT: "Does your mother know you are on jury duty?"

JUROR THIRTEEN: "Yes, she knows I'm at jury duty."

THE COURT: "She called you?"

JUROR THIRTEEN: "No, I called her. My cousin called me."

THE COURT: "Okay. And were you told that you are not supposed to have a telephone in the room talking on it while you're having jury deliberations?"

JUROR THIRTEEN: "No, they didn't tell me. There was also another person in there that was talking on

a cell phone at the same time I was so that's why I thought there was no problem."

The judge had juror thirteen temporarily sequestered from the other jurors and summonsed juror two, one of the jurors identified by the foreperson as having overheard juror thirteen on her cellular telephone, to the courtroom. After ascertaining that juror two had overheard juror thirteen speaking on the telephone, the judge conducted the following inquiry.

THE COURT:      "What did you overhear?"

JUROR TWO:      "She said that . . . the foreperson was going to go in and talk to you guys about what was going on in the jury room. That's the most distinct thing I heard."

THE COURT:      "Did you overhear anything else?"

JUROR TWO:      "She said that, you know, she's talking about how, like she's in trouble, you know, with all of us or something like that . . . ."

THE COURT:      "Was [*sic*] that the precise words that she used, she's in trouble?"

JUROR TWO:      "No."

THE COURT:      "Can you be more specific?"

JUROR TWO:      "I can't be precise with that. I just know she said the foreperson and — I know she said the foreperson, that was related to, in conjunction with what was going on before, you know, what was going on in the jury room."

THE COURT:      "Okay. We don't want to know about that part but I'm just trying to understand whether or not there was a conversation on the telephone that related to the jurors' deliberations."

| JUROR TWO: | "Yes." |
|---|---|
| THE COURT: | "And you're telling me that you did overhear such a conversation?" |
| JUROR TWO: | "Yes." |

Juror two also informed the judge that other jurors were on their cellular telephones as well. The judge told juror two not to discuss what they had just said and permitted her to return to the jury room.

Next, the judge questioned juror five, who had also been identified by the foreperson as having overheard juror thirteen on her cellular telephone.

| THE COURT: | "Can you tell me whether or not you overheard any conversations in the jury room on a cell phone by juror number thirteen?" |
|---|---|
| JUROR FIVE: | "Yes." |
| THE COURT: | "Okay. When did you overhear that conversation?" |
| JUROR FIVE: | "One earlier today but there was a couple on Friday also and —" |
| THE COURT: | "Alright. Just stick with the one today. When did that happen today? About what time?" |
| JUROR FIVE: | "It was after the note that [the foreperson] had sent to you. I don't know what time it was, before lunch time." |
| THE COURT: | "And what did you overhear?" |
| JUROR FIVE: | "Just bits and pieces but there was a remark that the person that was talking on the phone was complaining to whoever she was talking on the phone to about what was going on as far as us, the jury, and discussions." |

| THE COURT: | "How did you know what she was complaining about?" |
|---|---|
| JUROR FIVE: | "Because she mentioned one of the juror's [*sic*] names." |
| THE COURT: | "Okay. And did you overhear anything, any other part of the conversation?" |
| JUROR FIVE: | "No, just complaints and remarks on the phone." |
| THE COURT: | "Like, just give us an example." |
| JUROR FIVE: | "Some of these people here, they're talking about trust and this and that and people are just talking baloney and to that effect." |

The judge advised juror five not to discuss their conversation, and asked her to return to the jury room.

At the conclusion of this hearing, the judge found that juror thirteen had violated her oath and the orders of the trial judge not to discuss the deliberations with anyone. The judge stated that she did not "credit her response to my inquiries and I'm making that finding and I'm going to excuse her from further service on this jury." Counsel for Rodriguez objected and requested a mistrial, stating that juror thirteen was not the only juror who used a cellular telephone and expressing concern that juror thirteen was being "singled out" because she "may be the lone hold out." The judge responded by saying that "we haven't given any rule about using cellular telephones. The rule that [juror thirteen] violated is discussing the deliberations so I'm not excusing her because she talked on a cell phone." Counsel for Rodriguez responded that the judge did not know the nature of the other people's discussions on the cellular telephone: "The other people could have been talking about the deliberations but no one is complaining about them." The judge noted the objection.

Counsel for Lopez then turned his attention to the jury's note that referenced G. L. c. 234, § 26B, and asked the judge to inquire of the foreperson regarding how she had obtained that

citation. After an inquiry of the foreperson, a court officer brought juror fourteen into the courtroom and the juror explained that he had found the citation to the statute when he went "looking on the [I]nternet to see what laws were about jurors and jury duty and how it deals with a hung jury possibly." The juror assured the judge that he had found only that one statute. He further explained that he had brought it in with him that morning and the jurors "brought it up" while they were in the jury room. The judge informed the juror that she did not want to know about deliberations and allowed the juror to return to the jury room, but told him not to discuss their conversation.

The defendants all requested a mistrial. Counsel for Lopez argued that the research of the statute and the request for the oath appeared to be part of an "attack" on juror thirteen. Counsel for the third defendant weighed in, saying the jury's problem "seems to be beyond casual comments that may have been made on a cell phone." Counsel for Rodriguez added, "[T]here appears to be some kind of organized desire by certain jurors to get rid of either one or some other juror that they disagreed with. . . ."

The judge specifically asked the prosecutor to state his position on the subject of a mistrial for the record. The judge indicated that she would grant a mistrial if the prosecutor concurred with the defendants' request. The prosecutor replied that "in the absence of any indication that they are deadlocked, I would suggest that we continue forward with the alternate juror . . . ."

The judge then denied the defendants' request for a mistrial, finding that the introduction of the statute had "no impact on the integrity of the deliberations." The judge ruled as follows:

> "[L]et me be clear on the record why I'm doing what I'm doing. First of all, . . . I'm making a finding that juror number thirteen deliberately violated her oath by discussing the deliberations over the phone within the earshot of other jurors and it is my determination that that fundamentally impairs the integrity of the jurors' deliberations.
>
> "As to the research by the juror number fourteen, I find

that the research into General Laws Chapter 234, section [26B], while it may be considered an unauthorized act of research into the law, it does not affect the integrity of the deliberations because it does not relate to the substance of the allegations nor does it relate to the facts of this case and I'm finding that there is no impact on the integrity of the deliberations by this one juror's act."

The judge dismissed juror thirteen and seated the alternate juror. She then instructed the jury as follows: "You must start from scratch with the new juror . . . you are to make no assumptions about the process because the juror has been excused from your deliberations. Make no assumptions about that. That should not have an effect on your deliberations in any way whatsoever."

Two hours and twenty minutes later, the jury returned its verdicts, convicting Rodriguez and Lopez and acquitting the third defendant.

3. *Discussion.* a. *Dismissal of deliberating juror.* As the Supreme Judicial Court has stated, "[t]he discharge of a deliberating juror is a sensitive undertaking and is fraught with potential for error. It is to be done only in special circumstances, and with special precautions." *Commonwealth* v. *Connor*, 392 Mass. 838, 843 (1984). See *Commonwealth* v. *Kincaid*, 444 Mass. 381, 391 (2005) (a judge must exercise care not to "inquire into the deliberative process of the jury").

In the instant case, the situation was particularly complicated as the trial judge was presented with numerous, interrelated problems: a deadlocked jury looking for help from the trial judge to break the deadlock; angry juror thirteen, who was apparently a hold-out and had complained on a cellular telephone in the jury room about her fellow jurors; and another juror, who had presented his Internet legal research to the jury and whose research was referenced in the foreperson's request to the judge to remove juror thirteen.

The dismissal of a deliberating juror is governed by two statutes and Mass.R.Crim.P. 20(d)(3), 378 Mass. 891

(1979).[6] General Laws c. 234, § 26B, provides that a trial judge may discharge a deliberating juror if that juror "is unable to perform his duty for any . . . good cause shown." General Laws c. 234A, § 39, inserted by St. 1982, c. 298, § 1, provides that trial judges "shall have the discretionary authority to dismiss a juror at any time in the best interests of justice" and more specifically provides that trial judges "shall have the authority to . . . discharge [a deliberating juror] after a hearing only upon a finding of an emergency or other compelling reason."

The Supreme Judicial Court has defined "good cause" as "includ[ing] only reasons personal to a juror, having nothing whatever to do with the issues of the case or with the juror's relationship with his fellow jurors." *Commonwealth* v. *Connor*, 392 Mass. at 844-845. In the decisional law "good cause" has been construed as synonymous with the terms "in the best interests of justice" and "compelling reason" that are used in c. 234A, § 39. See *Commonwealth* v. *Swafford*, 441 Mass. 329, 336-337 & n.9 (2004). See also *Commonwealth* v. *Garrey*, 436 Mass. 422, 430-431 (2002). The Supreme Judicial Court has reasoned that, in the case of a deliberating juror, "[a]llowing discharge only for personal reasons ensures that such action will not 'affect the substance or the course of the deliberations.' " *Commonwealth* v. *Swafford*, *supra* at 336, quoting from *Commonwealth* v. *Connor*, *supra* at 845 n.4.

In the instant case, the judge found that juror thirteen had "deliberately violated her oath by discussing the deliberations over the phone [with a third party] within the earshot of other jurors." We defer to the judge's decision not to credit juror thirteen's account of her cellular telephone calls to her mother and cousin. The judge's finding was based on juror thirteen's testimony and demeanor, as well as the testimony and demeanor of three other jurors: juror two, juror five, and the foreperson. "Where a judge has seen and heard a witness, the judge determines credibility." *Commonwealth* v. *Rock*, 429 Mass. 609, 614 (1999). See *Commonwealth* v. *Freeman*, 442 Mass. 779,

---

[6]Rule 20(d)(3) is similar to G. L. c. 234, § 26B, except that it specifies that a judge may discharge a deliberating juror who "is unable to perform his duty for any other cause."

789 (2004). See also *Commonwealth* v. *Kincaid*, 444 Mass. at 388. The finding that the judge made, however, did not resolve all the issues presented.

The testimony of the three other jurors (two, five, and the foreperson) all focuses on juror thirteen's complaints about other jurors and their treatment of her. Furthermore, jurors two and five appeared only to be describing juror thirteen's complaint about the attempt to remove her from the jury. None of these jurors described her discussing trial evidence, the substance of the deliberations, or other issues separate and apart from her poor relations with other jurors.[7]

The judge's discharge, however, must be for reasons personal to the juror having nothing whatever to do with the juror's views on the case and her relations to her fellow jurors. In this case, it does not seem possible to separate the reasons for the juror's discharge from her views of the case and her relations to her fellow jurors. Juror thirteen's problems derived directly from the deadlocked jury, her apparent hold-out position, and her relations to her fellow jurors. Her complaints were about her fellow jurors' treatment of her — not the substance of the deliberations or anything separate from her relations to the other jurors. The only aspect "personal" to her was that she communicated those problems to her mother and her cousin in violation of the judge's instruction not to discuss the case with others. The judge herself did not make an express finding that juror thirteen's violation of her oath and instructions had nothing to do with her views in the case or her relations to her fellow jurors. We are left to infer that finding, which is not possible in these circumstances.

We are obviously not presented with the ordinary case of juror illness or other personal problems, such as drug or alcohol abuse, where the reason for the discharge is clearly separate from the juror's views on the issues of the case or the juror's relationship with fellow jurors. *Commonwealth* v. *Leftwich*, 430 Mass. 865, 872-874 (2000). This case is also distinguishable

[7]We note that if a trial judge decides to conduct any questioning of deliberating jurors, the judge must proceed with utmost caution to avoid "stray[ing] into revelation of the jury's thought process." *Commonwealth* v. *Kincaid*, 444 Mass. at 391.

from *Commonwealth* v. *Swafford, supra,* where the Supreme Judicial Court held that personal reasons having nothing to do with the issue of the case or with the juror's relationship with his fellow jurors can include an "idiosyncratic response" to "perceived slights . . . by another juror during the course of deliberations." *Id.* at 337. The juror in that case had "physically separated herself from the jury, took leave from participation in their deliberations, and told the judge four times that she could no longer be fair and impartial." *Ibid.* The court held that "the judge's finding that the juror's reclusive and abdicatory behavior was a problem personal to her, and not in any normal sense the product of her relationship to her fellow jurors, was not clearly erroneous." *Ibid.*

In the instant case, the juror was not questioned about her ability to be fair and impartial.[8] See *Commonwealth* v. *Connor,* 392 Mass. at 845. There were no findings that she had physically separated herself or refused to participate in deliberations. The exclusive stated basis for her discharge was her communications with her mother and cousin in violation of her oath and the judge's instruction. Although we do not in any way condone her behavior, that violation was inextricably connected to her relations to her fellow jurors, the deadlock, and her apparent hold-out status.

In circumstances where the Supreme Judicial Court has upheld the dismissal of a deliberating juror, the court has parenthetically pointed out that "there is nothing in the record to indicate that the jury were at an impasse, [and] thus 'there was no danger that a dissenting juror was allowed to evade her responsibilities.' " *Commonwealth* v. *Freeman,* 442 Mass. at 789, quoting from *Commonwealth* v. *Garrey,* 436 Mass. at 431. See *Commonwealth* v. *Leftwich,* 430 Mass. at 874; *Commonwealth* v. *Francis,* 432 Mass. 353, 368 (2000); *Commonwealth* v. *Swafford,* 441 Mass. at 337. Here, although it does not appear that juror thirteen was attempting to "evade her responsibilities," the jury foreperson had announced that

---

[8]"[I]f the 'problem' juror is questioned, the judge should preliminarily inform [her] that [she] cannot be discharged unless [she] has a personal problem, unrelated to [her] relationship to [her] fellow jurors or [her] views on the case." *Commonwealth* v. *Connor,* 392 Mass. at 845.

deliberations were at an impasse. The judge had given a *Rodriquez* charge before juror thirteen was discharged. It had been suggested that juror thirteen was the hold-out juror. When the judge was trying to determine whether to declare a mistrial, the prosecutor predicated his opposition on "the absence of any indication that [the jury] are deadlocked." Given the communications from the jury, this characterization was incorrect. "Although a mistrial may be expensive in both human and monetary costs, it is not to be avoided by intrusion into the jury's domain." *Commonwealth* v. *Connor*, 392 Mass. at 844.

We conclude that the judge's discharge of juror thirteen was not an appropriate exercise of the circumscribed discretion permitted the judge in the circumstances. In the situation presented here, the defendants were prejudiced by the discharge of juror thirteen. See G. L. c. 234A, § 74. See also *Commonwealth* v. *Swafford*, 441 Mass. at 336, and cases cited.[9]

b. *Jury instruction.* The jury instruction on the discharge provides an additional basis for reversal.[10] Even when the discharge of a deliberating juror is warranted, the jury must be instructed properly regarding the juror's removal. The instruction here was incomplete.

After juror thirteen was dismissed, the judge instructed the newly constituted jury to deliberate anew. She also told the jury:

---

[9]We also note more generally that the use of cellular telephones and other personal wireless devices should not be allowed during deliberations. "Incoming [or outgoing] calls [or other electronic communications] may disrupt the deliberative process of the jury or allow for the receipt of improper extraneous information." *Pagan* v. *State*, 809 N.E.2d 915, 922 (Ind. App. 2004). See *State* v. *Kell*, 101 Wash. App. 619, 622 (2000) (recommending that cellular telephones be barred from the jury room). As this case indicates, misuse may also be possible during breaks in deliberations. As these wireless devices become increasingly common and sophisticated — with Internet access and video and recording capabilities — and their use taken for granted as an ordinary and even habitual or reflexive part of daily life, careful instruction and monitoring by trial judges is required.

[10]By including this discussion of the instruction, we are not implying that the jury deliberations could have been salvaged in the very unusual circumstances presented here, most particularly juror thirteen's apparent hold-out status. We do want to underscore, however, the importance of giving a correct *Connor* instruction when a deliberating juror is properly discharged.

> "[Y]ou are *to make no assumptions about the process because the juror has been excused from your deliberations. Make no assumptions about that.*
>
> "*That should not have an effect on your deliberations in any way whatsoever.* I have made that determination based on the facts as I have found them and I don't need to go into that with you. . . ." (Emphases supplied.)

None of the defendants objected to this instruction or requested that it be supplemented with any additional language.

The defendants argue that the instruction failed to comport with the requirement that a judge, after dismissing a "problem" juror, inform the jury as provided in *Commonwealth* v. *Connor, supra,* "that the reason for discharge is entirely personal and has nothing to do with the discharged juror's views on the case or his relationship with his fellow jurors." *Id.* at 846. According to the defendants, the instruction created the risk that the remaining jurors would speculate that juror thirteen was dismissed because of her views on the case or her relationship to her fellow jurors. Because the defendants did not object, the error, if any, must be reviewed to determine whether it created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Zimmerman,* 441 Mass. 146, 151 (2004).

The judge did not use the language set forth in *Connor* to explain the juror's discharge. The question, therefore, is whether a *Connor* instruction was necessary and, if it was, whether the instruction given was adequate. As the court stated in *Commonwealth* v. *Zimmerman,* "[t]here will be occasions where the circumstances surrounding the dismissal of a deliberating juror will leave no room for speculation as to the reason for the discharge, such that the failure to give a *Connor* instruction is not error. . . . But such circumstances will be rare . . . ." *Id.* at 151.

This is not such a rare case. The jury had ample reason to speculate that the discharge related to juror thirteen's views on the case and her relationship to her fellow jurors, not her violation of her oath and the judge's instructions not to discuss the deliberations. Both the judge and the jury were trying to break the deadlock in deliberations and juror thirteen appears to have

been the lone hold-out; another juror, in violation of his oath and the judge's instructions, had done Internet research to break the deadlock and perhaps help remove juror thirteen; the researching juror was not discharged, but juror thirteen had been; juror thirteen was also not the only juror on her cellular telephone during breaks in deliberations, but she was the only one questioned about her calls; her calls related primarily to her treatment by her fellow jurors, and not the substance of the deliberations themselves.

The Commonwealth contends that the judge's instruction was adequate in these circumstances even though it did not track *Connor*. It is true that "[a] judge is not required in every case to adhere to the precise language [the court] used in *Commonwealth* v. *Connor*." *Commonwealth* v. *Zimmerman, supra* at 151. See *Commonwealth* v. *Tennison*, 440 Mass. 553, 556 (2003) (new jury informed that juror "had been discharged for personal reasons, and instructed . . . that they were not to speculate on the reasons for the discharge"). Nevertheless, in those cases where a departure is justified, the judge must give the jury "some explanation, appropriate to the circumstances, sufficient to quell any inappropriate speculation regarding [the] juror['s] dismissal." *Commonwealth* v. *Zimmerman, supra* at 151.

In this case, simply telling the jury not to speculate, when speculation was inevitable, was not sufficient. *Id.* at 151-152. Indeed, it is difficult to imagine that any instruction could have prevented speculation in these circumstances.

c. *Extraneous evidence.* At trial, the defendants also moved for a mistrial based on the jury's improper exposure to G. L. c. 234, § 26B, the statute that juror fourteen had found on the Internet.[11] The judge denied the motion and explained, "it does not relate to the substance of the allegations nor does it relate to the facts of this case."

We recognize that the statute addresses impaneling, sequester-

---

[11]The trial judge properly instructed the jury not to do their own research and investigation. The instruction obviously encompassed Internet research as well, although juror fourteen either ignored or misunderstood the instruction. Regardless, given the simplicity, speed, and scope of Internet searches, allowing a juror to access with ease extraneous information about the law and the facts, trial judges are well advised to reference Internet searches specifically when they instruct jurors not to conduct their own research or investigations.

ing, and discharging jurors and is therefore procedural in nature. As such, it bears no direct relationship to the evidence admitted at trial, to any of the live substantive issues, or to the elements of the offense with which the defendants were charged.

That being said, it was researched by one juror concerned about the deadlock, and its introduction into the deliberations signaled that the jury may have been trying to remove a dissenting juror. The jury's uninstructed consideration of the statute reinforces our conclusion that the verdicts cannot stand.

*Judgments reversed.*

*Verdicts set aside.*